# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: March 20, 2024

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| TOMMIE HUMBERT, JR., | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 17-360V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision Awarding Damages; Influenza |
| AND HUMAN SERVICES, | * | ("Flu") Vaccine; Shoulder Injury Related to |
| | * | Vaccine Administration ("SIRVA"); Pain |
| Respondent. | * | and Suffering. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Joseph Alexander Vuckovich, Maglio Christopher and Toale, Washington, DC, for Petitioner.
Debra A. Filteau Begley, U.S. Department of Justice, Washington, DC, for Respondent.

**DAMAGES DECISION**[1]

On March 17, 2017, Tommie Humbert, Jr. ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2]  Petitioner alleges that he suffered a left shoulder injury as the result of an influenza ("flu") vaccination administered on November 21, 2014.  Petition at 1 (ECF No. 1).  On February 22, 2023, the undersigned issued a ruling on entitlement, finding that

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

Petitioner was entitled to compensation.  Ruling on Entitlement dated Feb. 22, 2023 (ECF No. 120).

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs.  Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that Petitioner is entitled to $50,000.00 for actual pain and suffering.

**I.    PROCEDURAL HISTORY**

Petitioner filed his petition on March 17, 2017.  Petition.  The early procedural history from March 2017 through February 2023 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here.  See Ruling on Entitlement at 2-3.

Thereafter, the parties engaged in settlement discussions but were not able to resolve this matter informally.  Joint Status Report ("Rept."), filed June 9, 2023 (ECF No. 129).  The parties believed ADR would not be productive and requested a briefing schedule.  Id.  On August 4, 2023, Petitioner filed a brief in support of his claim for damages.  Petitioner's Motion for Findings of Fact and Conclusions of Law Regarding Damages ("Pet. Mot."), filed Aug. 4, 2023 (ECF No. 131).  Respondent filed his responsive brief on October 6, 2023.  Respondent's Brief on Damages ("Resp. Br."), filed Oct. 6, 2023 (ECF No. 132).  Petitioner filed a reply on October 25, 2023.  Pet. Reply Memorandum in Support of Pet. Mot. ("Pet. Reply Memo."), filed Oct. 25, 2023 (ECF No. 135).

This matter is now ripe for adjudication.

**II.   FACTUAL HISTORY**

   **A.    Medical Record History**

The Ruling on Entitlement issued on February 22, 2023, and it set forth a summary of Petitioner's medical records and affidavits.  See Ruling on Entitlement at 4-11.  Further, the parties have set forth summaries of relevant facts which support their respective positions in their briefs, which the undersigned has reviewed as well as all the medical records and evidence filed in this matter.

A brief summary of some facts relevant to this Decision follows.  While all the records are important, these entries provide specific information about Petitioner's condition important to the undersigned's Decision.

On November 21, 2014, at 49 years of age, Petitioner received a flu vaccine in his left arm.  Pet. Ex. 1 at 2.  Petitioner's prior medical history was unremarkable.  Ruling on Entitlement at 4.

On December 8, 2014, Petitioner presented to primary care physician, Dr. Sherman G. Ibarra, with a chief complaint of "pain in left arm." Pet. Ex. 2 at 40. Dr. Ibarra documented, "[Petitioner] had mild pain in his left shoulder after his flu shot a couple weeks ago. About [two] days after the flu shot [Petitioner] started getting shooting pains around his shoulder and down to his forearm." Id. Petitioner reported shooting pain down his arm when he raised his arm and turned his head as well as "mild numbness at the tip of his left index finger." Id. Physical examination revealed "[m]ild decreased sensation at finger pad area of left index finger" and "[m]ild left shoulder pain with impingement testing." Id. at 41. Petitioner's strength in his left shoulder was 5/5 and he had pain with abduction and turning his head to the right. Id. There was no tenderness to palpation of the cervical spine, left shoulder, or left upper arm. Id. Assessment was "[l]eft shoulder pain with radiation" and "[l]eft index finger neuralgia." Id. at 42. Petitioner was prescribed a Medrol Dose Pak and declined a neurology referral. Id.

Petitioner returned to Dr. Ibarra on December 12, 2014 and reported he felt better. Pet. Ex. 2 at 44. Specifically, his left arm pain and left finger numbness were better. Id. He felt the pain was stemming from an area between his left shoulder and neck. Id. On physical examination, Petitioner had no pain with testing, had 5/5 strength in left shoulder, and was tender to palpation with muscle spasm in area between shoulder and neck (trapezius). Id. at 45. Diagnosis was "[l]eft shoulder upper extremity pain and finger neuralgia." Id. Petitioner declined any additional testing, referral, specialists, and physical therapy. Id. at 45-46. Dr. Ibarra directed Petitioner to apply hot and cold compresses to his left trapezius area and to follow up in two-to-three weeks. Id. at 46.

At a follow-up visit on December 31, 2014, Petitioner had full range of motion in his left shoulder and no swelling, edema, or tenderness.[3] Pet. Ex. 2 at 48. Assessment was "[left] shoulder pain etio[logy]? Poss[ible] neuropraxia."[4] Id. Petitioner was directed to continue taking Meloxicam[5] and Flexeril,[6] perform shoulder exercises, and apply alternating hot and cold compresses as needed. Id.

---

[3] This record is handwritten and difficult to read.

[4] Neuropraxia is the "failure of conduction in a nerve in the absence of structural changes, due to blunt injury, compression, or ischemia." Neurapraxia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=33618 (last visited Mar. 15, 2024).

[5] Meloxicam is "a nonsteroidal antiinflammatory drug used in the treatment of osteoarthritis." Meloxicam, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/ definition?id=30286 (last visited Mar. 15, 2024).

[6] Flexeril is "used as a skeletal muscle relaxant for relief of painful muscle spasms." Flexeril, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id= 18790 (last visited Mar. 15, 2024); Cyclobenzaprine Hydrochloride, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=12135 (last visited Mar. 15, 2024).

Petitioner saw internist Dr. Charles Dinwiddie on January 30, 2015 for a follow-up visit for issues unrelated to his left shoulder. Pet. Ex. 5 at 18. No complaints of pain or numbness in his left shoulder or arm were documented. See id. at 18-19. Physical examination noted full range of motion. Id. at 19.

Petitioner returned to Dr. Ibarra's office on April 14, 2015 for "[l]eft shoulder pain since 11/2014." Pet. Ex. 2 at 49. Petitioner stated that since his flu vaccine in November, he has had continuous pain in his left shoulder. Id. He reported complaints of pain with range of motion of shoulder and left scapular[7] and supraspinatus[8] pain at the visit. Id. Overall, Petitioner "state[d] that [his] shoulder pain [was] improving, however he would 'like something done' because . . . it [was] 'not going away.'" Id. at 51.

Under history of present illness, nurse practitioner ("NP") Michelle L. Myers documented Petitioner's left shoulder pain was moderate, fluctuated in intensity, and was improving. Pet. Ex. 2 at 49. "The shoulder problem occurred 6.5 month(s) ago." Id. The pain radiated to the neck and down the arm to the left index finger, with numbness in his left index finger. Id. Pain was exacerbated with movement, and relieved with "immobilization, heat application, medication, physical therapy[,] and steroids given in December." Id. On physical examination, Petitioner had full range of motion, normal and equal strength bilaterally, equal grip strength bilaterally, equal sensation bilaterally in hands and fingers, no evidence of impingement, and brachial reflex equal bilaterally. Id. at 50-51. The "[o]nly abnormal result was [Petitioner's] complaint of tenderness to left trapezius, tenderness at the acromion process with palpation." Id. at 51. Diagnosis was "shoulder pain." Id. Petitioner was directed to continue range of motion exercises and was prescribed Flexeril and prednisone. Id.

Petitioner returned to Dr. Dinwiddie's and to Dr. Ibarra's offices in August 2015, February 2016, and March 2016. Pet. Ex. 2 at 52-57; Pet. Ex. 5 at 20-23. Physical examinations conducted during these visits did not indicate issues with Petitioner's left shoulder or arm. See Pet. Ex. 2 at 52-57; Pet. Ex. 5 at 20-23. No complaints of left shoulder pain were documented during these visits. See Pet. Ex. 2 at 52-57; Pet. Ex. 5 at 20-23. But see Pet. Exs. 13-14.

On August 16, 2016, Petitioner sought treatment for a neck and upper arm injury sustained at work on July 23, 2016. Pet. Ex. 10 at 28.

---

[7] Scapular includes the region of the back overlying the scapula, the bone behind the shoulder. Regio Scapularis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=103247 (last visited Mar. 15, 2024); Scapula, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=44756 (last visited Mar. 15, 2024).

[8] Supraspinatus muscle originates in the scapula and inserts into the humerus, "the long bone of the arm that articulates with the scapula at the shoulder and with the radius and ulna at the elbow," and is used to abduct the humerus. Musculus Supraspinatus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=90974 (last visited Mar. 15, 2024); Humerus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=23196 (last visited Mar. 15, 2024).

4

In the Ruling on Entitlement, the undersigned found "Petitioner suffered from shoulder pain from November 2014 until August 2015" and there was "[no] evidence of continued shoulder pain from flu vaccination after August 2015." Ruling on Entitlement at 27-28, 28 n.30. And therefore, the undersigned determined "Petitioner may not recover damages for any pain or injury after August 2015."

### B.     Affidavits and Letters

#### 1.     Petitioner

Petitioner stated he received a flu vaccine on November 21, 2014 in his left arm. Pet. Ex. 6 at ¶¶ 1, 3. Prior to vaccination, Petitioner had no history of left shoulder injury. Id. at ¶ 12. "During the vaccination, blood ran down [his] left arm from the injection site." Id. at ¶ 5. "Within 24 hours of receiving the vaccination, [he] began to experience pain in [his] left shoulder," which "became excruciating in the months following." Id. at ¶¶ 6-7. The pain, which he described as "intense" and "stabbing," was "the most intense pain that [he] had ever experienced." Id. at ¶¶ 7, 9. The pain affected his sleep. Id. at ¶ 8. "Often [he] would wake up screaming in the middle of the night, having moved [his] arm in a manner that aggravated the pain." Id. He eventually "[tied] [his] left arm to [his] torso with a belt" to keep his arm from moving while he slept. Id.

At the time of vaccination in the fall of 2014, Petitioner's job was physically demanding. Pet. Ex. 19 at ¶ 2. In the weeks following his shoulder injury, he found work difficult "due to the intense pain in [his] left shoulder." Id. at ¶ 3. Thus, he requested less physical work duties and received a change in job duties around Thanksgiving 2014, shortly after his vaccination. Id.

In his free time, Petitioner enjoyed spending time with his daughter, coaching youth basketball, and participating in horse pulling, which he explained have all been affected by his shoulder injury. Pet. Ex. 19 at ¶ 5. While coaching, Petitioner was unable to demonstrate certain basketball skills and had difficulty carrying equipment at practices and games. Id. at ¶ 6. With competitive horse pulling, he would compete as part of a team as the "hitcher," or "the person who, at the start of the event, actually hitches the team of horses to the pre-measured weight that they are to pull." Id. at ¶ 7. Petitioner explained "[t]his is a physically challenging task because the hitching has to be done quickly, before the horses start to move." Id. "Prior to [his] shoulder injury, [he] was known as a very competent hitcher." Id. Although he writes with his right hand, he would use his left hand and arm to hitch. Id. at ¶ 8. Since his shoulder injury, he has "seldom participated in these events" and "[his] performance in horse pulls has never returned to its pre-injury level." Id.

#### 2.     Letters from Dr. Charles B. Dinwiddie's Office

Dr. Dinwiddie provided one letter. Pet. Ex. 13 at 1. He remembered Petitioner stating "[h]e had received a vaccine and that he had some type of reaction from the injection, to his shoulder." Id. Dr. Dinwiddie stated Petitioner first told him of this injury at his appointments in

January and August 2015.[9]  Id.  Dr. Dinwiddie stated "[he] did not examine the area of reaction during those appointments."  Id.

Licensed practical nurse ("LPN") Debbie Nellen, who works with Dr. Dinwiddie, also provided one letter.  Pet. Ex. 14 at 1.  She stated "[Petitioner] called the office complaining of pain at an injection site from a [f]lu vaccine administered to him from [a] nurse at work."  Id.  She informed Petitioner that Dr. Dinwiddie was not in the office and instructed him to return to the clinic where he received the vaccine so they could examine him.  Id.  She also told him that he could apply an ice pack to reduce any swelling, pain, or redness.  Id.  During the five weeks Dr. Dinwiddie was out of the office, she received multiple phone calls from Petitioner.  Id.  She "attributed some of this to his anxiety about his arm, but always referred him back to the medical staff at his place of employment."  Id.  She also suggested Petitioner could go to a walk-in clinic if need be.  Id.  At his January 2015 appointment, she remembered Petitioner showing her where his injection was given and complaining of "continued . . . problems with pain in his shoulder that he attributed to the injection site."  Id.  Petitioner reported he was continuing to be followed by the clinic at work.  Id.  LPN Nellen "[did] not recall discussing this with him after April 2015 other than for him to mention that his shoulder was slowly getting better."  Id.

### 3. Tim Humbert's Affidavit

Petitioner's brother, Tim Humbert, explained that hitching is very difficult and physically demanding.  Pet. Ex. 20 at ¶¶ 1, 3, 6.  Petitioner began hitching when he was 12 or 13 years of age and began competing at 15 years of age.  Id. at ¶ 4.  "At the time of [Petitioner's] 2014 shoulder injury, [Petitioner] had been regarded for some time as one of the best hitchers involved in competitive horse-pulling throughout the Midwest."  Id.  "By late November 2014[,] [Petitioner] had been an essential part of [the] team" and their team faced "a serious setback when [Petitioner] was unable to help with harnessing."  Id. at ¶ 6.  Mr. Humbert had to take over this job.  Id.  After Thanksgiving 2014, Petitioner was unable to hitch due to his shoulder injury.  Id. at ¶ 7.  Mr. Humbert remembered Petitioner was unable to pick up the hitch in June 2015, and thus, they had to find a substitute hitcher.  Id.  Petitioner was able to practice and compete about one-and-one-half years later, however, Mr. Humbert averred Petitioner has not been the same since his 2014 shoulder injury.  Id. at ¶ 8.

### 4. Andy Wagner's Affidavit

Andy Wagner is a family friend of the Humbert family and has known Petitioner for "many years."  Pet. Ex. 23 at ¶ 1.  Mr. Wagner is also involved in horse pulling.  Id. at ¶ 2.  He noted that Petitioner was one of the best hitchers in horse pulling in the Midwest.  Id. at ¶ 4.  "Hitching is tough, physical work, as is horse pulling in general.  There is no way that a person with a serious shoulder injury could harness or hitch horses in competition."  Id. at ¶ 6.

Shortly before the 2015 season, which began in April or May, the Humbert family approached Mr. Wagner about filling in for Petitioner as their team's hitcher.  Pet. Ex. 23 at ¶¶ 5, 7.  Mr. Wagner was told "[Petitioner] couldn't hitch because he had hurt his shoulder and the

---

[9] These appointments occurred on January 30, 2015 and August 14, 2015.  Pet. Ex. 5 at 18-21.

pain made it impossible for him to hitch," which he understood to mean Petitioner's "shoulder injury was a severe physical limitation, not only because of the way it was described to [him] but also because [he] kn[e]w how much [Petitioner] loved pulling horses" and "[i]t would take very severe pain to keep him out of competition for an entire season." Id. at ¶ 7. Mr. Wagner substituted for Petitioner as hitcher for the 2015 competition season, which ended in September. Id. at ¶ 8.

### 5. Amanda Dunnuck's Affidavit

Amanda Dunnuck is a family friend of Petitioner. Pet. Ex. 24 at ¶ 1. She is an attorney and municipal judge in Indiana. Id. at ¶ 2. She remembered Petitioner complaining of shoulder pain that began when he received a flu shot during the fall and winter of 2014. Id. at ¶ 4. She explained that she remembered this clearly due to important events in her professional career occurring at the same time. Id.

Ms. Dunnuck attended a variety of community events, including the youth basketball games Petitioner's daughter played in. Pet. Ex. 24 at ¶ 5. During the 2014-2015 season, following a basketball game Ms. Dunnuck did not attend, Petitioner called to complain of shoulder pain that occurred when someone touched his shoulder at the game. Id. Ms. Dunnuck found it unusual for Petitioner to complain "because [he] is usually very stoic, and, to [her] it indicated the severity of the pain he was experiencing." Id. She indicated this phone call would have occurred before the end of the basketball season, which was in March 2015. Id.

Ms. Dunnuck also recalled Petitioner's shoulder injury prevented him from participating in competitive horse pulling in the summer of 2015. Pet. Ex. 24 at ¶ 6. During this time, they communicated almost daily. Id. "[Petitioner] often talked about the pain in his shoulder and he mentioned repeatedly that the shoulder pain was the reason he was not pulling." Id. "[Petitioner] also told [Ms. Dunnuck] that he was belting his arm to his body before bed, since this kept the shoulder from moving and waking him up with pain." Id.

### 6. Tambrea Reeder's Affidavit

Tambrea Reeder lives near Petitioner and sees him frequently. Pet. Ex. 27 at ¶ 2. Ms. Reeder saw Petitioner on the date of his vaccination. Id. She stated she immediately knew something was wrong because "[h]e was clearly in a lot of pain." Id. Petitioner told her that he had [] a flu vaccination and his shoulder had been in pain since the vaccination. Id.

Their families spent Thanksgiving 2014 together at Ms. Reeder's house. Pet. Ex. 27 at ¶ 3. Ms. Reeder remembered Petitioner experiencing severe shoulder pain on Thanksgiving, explaining "[Petitioner] complained about [the pain], which was unlike him, and at one point the pain was so bad that he needed to go to [her] spare bedroom to lie down." Id. She found this behavior "completely out of character" and explained "he would not have done this if he had not been in serious pain." Id.

Throughout late fall and winter of 2014 to 2015, Ms. Reeder remembered Petitioner holding his arm in a certain position "because he said it helped with the pain in his shoulder."

Pet. Ex. 27 at ¶ 4.  She remembered this because she thought it was a "very unusual way for a person to hold [their] arm."  Id.  Additionally, she found "it [] unlike [Petitioner] to complain about physical pain so the fact that he did so is memorable."  Id.

Ms. Reeder's daughter also plays basketball, so she attended many of the games during the 2014-2015 season.  Pet. Ex. 27 at ¶ 5.  She remembered seeing Petitioner at these games with his arm in a strange position, close to his chest, which he explained helped with the pain.  Id. at ¶ 6.

Ms. Reeder saw or spoke to Petitioner almost daily in 2015.  Pet. Ex. 27 at ¶ 8.  She stated Petitioner "frequently mentioned the pain" during this time.  Id.  She saw Petitioner in his home with his arm tied "close to his body and in front of and toward the center of his chest" with a belt, which he indicated would keep his arm from moving while he slept.  Id. at ¶ 9.

### III.  PARTIES' CONTENTIONS

#### A.  Pain and Suffering

##### 1.  Petitioner's Contentions

Petitioner requests a pain and suffering award of $65,000.00.  Pet. Mot. at 12, 16.  Petitioner contends his medical records, affidavits, and letters show his injury resulted in "severe, physically limiting pain from the date of vaccination, November 21, 2014, to August 2015."  Id. at 12.  During this time, he experienced significant emotional distress as he was unable to fully participate in his hobbies of coaching youth basketball and horse pulling.  Id.  Additionally, witnesses attest to Petitioner not being himself during Thanksgiving 2014.  Id.

Petitioner argues significant weight should be given to the testamentary evidence offered by Petitioner because this evidence is "consistent, clear, cogent, and compelling."  Pet. Mot. at 13 (quoting Camery v. Sec'y of Health & Hum. Servs., 42 Fed. Cl. 381, 391 (1998) ("Oral testimony that is inconsistent with medical records must be consistent, clear, cogent and compelling to outweigh medical records prepared for the purpose of diagnosis and treatment.")); see also Pet. Reply Memo. at 4-6.  For example, Petitioner contends the affidavits are all consistent because Petitioner, Ms. Reeder, and Ms. Dunnuck each describe Petitioner using a belt to secure his arm to his body to limit pain while sleeping and all of the affidavits describe the effects of Petitioner's injury on his ability to participate in horse pulling.  Pet. Mot. at 13.  Petitioner also reasons the affidavits are "clear insofar as they are internally consistent and they all straightforwardly describe key events in the course of Petitioner's pain and suffering" and "cogent because they illustrate the ways in which [Petitioner's] life was affected by his injury and show him changing his behavior in ways that could only reflect severe pain and suffering from a shoulder injury."  Id. (emphasis omitted).  Lastly, Petitioner explains his affidavits are compelling due to the "vivid details" provided.  Id. at 14.

In his reply memorandum, Petitioner indicates his fact testimony was offered to supplement the medical records because the affidavits and letters "discuss[] information that would not have been pertinent during a medical visit," as they discuss details "irrelevant to

8

treatment," and thus, would not have been brought up by Petitioner during his visits. Pet. Reply Memo. at 3-6.

Next, Petitioner discusses prior Vaccine Program cases to support his request for pain and suffering. Pet. Mot. at 14. In the first case, Klausen, the special master awarded $60,000.00 for pain and suffering where the petitioner underwent a "more extensive [treatment] than [Petitioner]" consisting of five cortisone injections, a shoulder MRI, and 16 sessions of physical therapy. Id. at 14-15 (citing Klausen v. Sec'y of Health & Hum. Servs., No. 19-1977V, 2023 WL 2368823, at *1, *5 (Fed. Cl. Spec. Mstr. Feb. 2, 2023)); Pet. Reply Memo. at 7 (acknowledging "Mr. Klausen's treatment was indisputably more involved tha[n] [Petitioner's]"). However, both Petitioner and the Klausen petitioner had difficulty sleeping due to their injuries. Pet. Mot. at 15 (citing Klausen, 2023 WL 2368823, at *5). Unlike the Klausen petitioner who waited three months to seek treatment, Petitioner saw Dr. Ibarra 17 days after his vaccination. Id. (citing Klausen, 2023 WL 2368823, at *5-6). And Petitioner here provided numerous affidavits and letters from fact witnesses, which the Klausen petitioner did not. Id. (citing Klausen, 2023 WL 2368823, at *5). Lastly, Petitioner contends he was in "excruciating" pain, while the Klausen petitioner reported his pain was 4/10 at its worst. Id. (citing Klausen, 2023 WL 2368823, at *5). Therefore, Petitioner maintains his request for $65,000.00, which is $5,000.00 more than the Klausen petitioner was awarded, is reasonable. Id.

Petitioner next cites Russo v. Secretary of Health & Human Services, No. 20-1419V, 2022 WL 4717927 (Fed. Cl. Spec. Mstr. Aug. 31, 2022)). Pet. Mot. at 15. The petitioner in Russo was awarded $63,000.00 for pain and suffering. Id. (citing Russo, 2022 WL 4717927, at *1). The Russo petitioner did not have surgery, an MRI, or steroid injections. Id. (citing Russo, 2022 WL 4717927, at *4). Her treatment consisted of four primary care visits, one urgent care visit, an X-ray, an ultrasound, one prescription medication, and 12 physical therapy sessions. Id. (citing Russo, 2022 WL 4717927, at *4). Petitioner contends this treatment course is similar to Petitioner's "if slightly more extensive." Id. at 15-16 (citing Russo, 2022 WL 4717927, at *4). However, Petitioner provided more detailed witness testimony than the Russo petitioner. Id. at 16. Therefore, Petitioner concludes "[t]here is more and better evidence of pain and suffering in [Petitioner's] case than there was in [Russo]," and Petitioner's request for pain and suffering is approximately equal to that awarded in Russo. Id.

Lastly, Petitioner cited to Knauss, where the special master awarded $60,000.00 for pain and suffering after a treatment course that consisted of physical therapy, an X-ray, two MRIs, and a steroid injection. Pet. Mot. at 16 (citing Knauss v. Sec'y of Health & Hum. Servs., No. 16-1372V, 2018 WL 3432906, at *2-4, *7 (Fed. Cl. Spec. Mstr. May 23, 2018)). Petitioner notes the Knauss petitioner did not seek treatment for three months post-vaccination, unlike Petitioner here who sought treatment 17 days post-vaccination. Id. (citing Knauss, 2018 WL 3432906, at *7). Like Klausen, this delay in seeking treatment was cited by the special master in determining the appropriate award for pain and suffering. Id. (citing Knauss, 2018 WL 3432906, at *7; Klausen, 2023 WL 2368823, at *6). Both Petitioner and the Knauss petitioner experienced emotional distress due to their injuries preventing them from participating in activities they enjoyed (horse pulling here, and a mission trip in Knauss). Id. (citing Knauss, 2018 WL 3432906, at *4, *7).

### 2. Respondent's Contentions

Respondent argues that based on the facts of this case, Petitioner should be awarded $35,000.00 for pain and suffering. Resp. Br. at 1, 13-14. First, Respondent does not dispute awareness of injury. Id. at 8.

Respondent contends Petitioner's medical records categorize his injury as "mild" when complaints related to his shoulder were documented. Resp. Br. at 8. For support, Respondent cites to Dr. Ibarra's record from December 8, 2014, which indicated Petitioner demonstrated "mild left shoulder pain with impingement testing" and "pain [in the] left should with abduction and turning his head to the right." Id. (quoting Pet. Ex. 2 at 40-41). Respondent notes all subsequent visits documented a normal left shoulder on examination. Id.

Petitioner's next visit to Dr. Ibarra was on December 12, 2014 and Dr. Ibarra documented a normal shoulder examination, no pain with impingement testing, and only tenderness to palpation in an area between his shoulder and neck (trapezius). Resp. Br. at 8 (citing Pet. Ex. 2 at 45). Respondent argues this tenderness was not in the shoulder and thus, not related; however, even if it was related, Petitioner's shoulder examination was normal at this visit. Id. at 8-9 (citing Pet. Ex. 2 at 45). At another follow-up visit with Dr. Ibarra on December 31, 2014, Petitioner's shoulder examination was normal with a normal range of motion and no tenderness. Id. at 9 (citing Pet. Ex. 2 at 48).

Then on April 14, 2015, Petitioner returned to Dr. Ibarra's office with shoulder complaints since his November 2014 flu vaccination. Resp. Br. at 9 (citing Pet. Ex. 2 at 49-51). Respondent noted Petitioner's symptoms were intermittent, occurring only once or twice a week, and Petitioner reported new symptoms of scapular and supraspinatus pain, despite having a normal left shoulder examination. Id. (citing Pet. Ex. 2 at 51). Tenderness to palpation of the acromion and trapezius muscles was noted on examination. Id. (citing Pet. Ex. 2 at 51). Additionally, Petitioner's shoulder pain was noted to be improving and he was prescribed a course of oral steroids and Flexeril. Id.

Respondent summarizes that the medical records document four visits where shoulder pain was discussed, two prescriptions for oral steroids, one prescription for Meloxicam, and two prescriptions for Flexeril. Resp. Br. at 9. Petitioner did not use his neurology and physical therapy referrals, nor did he see a specialist, undergo imaging, or receive steroid injections. Id. Additionally, Respondent points to gaps in medical care, as Petitioner did not seek treatment for his shoulder pain between January 1, 2015 and April 13, 2015 and between April 15, 2015 and August 2015. Id. Respondent argues these gaps in treatment should be taken into account by the special master when determining the award for pain and suffering because "while [P]etitioner's care extended across a ten-month period, that period is marked by gaps in care totaling almost eight months, which suggest that [] [P]etitioner was not likely experiencing severe symptoms during that time." Id. at 9-10 (citing Shelton v. Sec'y of Health & Hum. Servs., No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) ("Treatment gaps are a relevant consideration in determining the degree of Petitioner's pain and suffering.")).

Next, with regard to Petitioner's reliance on affidavit testimony, Respondent argues these affidavits are unreliable because they are contradicted by the contemporaneous medical records. Resp. Br. at 10. For example, Petitioner's affidavit indicates his pain was so severe he had to change his position at work around Thanksgiving 2014, the week following his flu vaccination. Id. at 10-11. Respondent notes, however, that Petitioner provided no objective evidence to support the contention that Petitioner's shoulder injury was so severe to force him to change his job or impact his work. Id. Respondent summarizes that "Petitioner's employment file does not evidence any job change at that time, and his timesheets show that he did not take any sick leave during the week following his vaccination." Id. at 11 (citing Pet. Ex. 18 at 10-11) While he took seven sick days in December 2014, "he returned to his normal work schedule in 2015, and he did not take a single day of sick leave until July 2015" and only took two sick days in 2015. Id. (citing Pet. Ex. 18 at 11).

Respondent also argues there is no objective evidence of extreme shoulder pain with movements as Petitioner contends in his affidavit. Resp. Br. at 11. For support, Respondent cites to Dr. Ibarra's records from December 2014 to April 2015 and notes only pain with impingement was documented on December 8, 2014 while all other examinations were normal. Id. Next, Respondent notes there is no objective evidence of extreme pain with palpation, as indicated in Ms. Dunnuck's affidavit, and contradicted by Dr. Ibarra's physical examinations documenting no pain in the left shoulder or upper extremity with palpation. Id. at 11-12 (citing Pet. Ex. 24 at ¶ 5; Pet. Ex. 2 at 41, 45, 48). Lastly, Respondent argues Mr. Wagner's affidavit is based on hearsay and speculation as he has no firsthand observations of Petitioner or recollections of who indicated Petitioner was unable to participate in horse pulling. Id. at 12.

Respondent concludes "the most reliable evidence offered in this case are [P]etitioner's medical records, which document that any shoulder pain he experienced was particularly mild and only minimally impacted his shoulder movement, and these facts do not justify the pain and suffering amount sought by [P]etitioner of $65,000.00." Resp. Br. at 12.

Respondent next discusses the cases relied upon by Petitioner and argues they "do not support [P]etitioner's claims and they instead demonstrate exactly why [P]etitioner should not receive the amount sought." Resp. Br. at 12. First, the petitioner in Klausen was awarded $60,000.00 for pain and suffering and he sought significantly more care than Petitioner, including an MRI, five steroid injections, 16 physical therapy sessions, and only regained 10% of normal function, resulting in 40% loss of function following treatment. Id. at 12-13 (citing Klausen, 2023 WL 2368823, at *5-6). The Knauss petitioner was also awarded $60,000.00 for pain and suffering after a treatment course consisting of two MRIs, 25 physical therapy visits, one steroid injection, and several gaps in treatment lasting several months with symptoms extending over one year. Id. at 13 (citing Knauss, 2018 WL 3432906, at *2-4, *7). The court in Klausen and Knauss considered the large gaps in treatment when determining an appropriate award. Id. (citing Klausen, 2023 WL 2368823, at *6; Knauss, 2018 WL 3432906, at *7). Lastly, in Russo, the medical records document objective evidence of shoulder dysfunction and pain, with a treatment course including an urgent care visit for significant pain, one prescription, an X-ray, a shoulder ultrasound, two rounds of physical therapy, and two iontophoresis treatments. Id. (citing Russo, 2022 WL 4717927, at *4). Respondent argues Petitioner should not receive similar awards to those in Russo, Knauss, and Klausen because Petitioner sought

11

treatment for shoulder pain only four times, objective evidence of shoulder pain was noted only at his first visit to a medical provider, Petitioner declined referrals to specialists and physical therapy, Petitioner underwent no imaging, and Petitioner did not receive any steroid injections. Id.

Respondent maintains a pain and suffering award of $35,000.00 is a fair award for Petitioner's mild shoulder pain. Resp. Br at 13. Respondent did not provide any case law to support his award of $35,000.00.

## IV. LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge

12

Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

V.     ANALYSIS

    A.     **Petitioner's Award for Actual Pain and Suffering**

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  The undersigned has reviewed the entire record, including medical records, declarations, expert reports, and all other evidence that has been filed, and finds an award of $50,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

It is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering.  Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and he has full awareness of his suffering.

The factors that particularly influence this Decision are as follows.  Regarding duration, "Petitioner suffered from shoulder pain from November 2014 until August 2015," or less than 10 months.  Ruling on Entitlement at 27.

Regarding severity, the undersigned find Petitioner had a mild to moderate shoulder injury.  From his flu vaccination in November 2014 to August 2015, Petitioner saw his primary care physician Dr. Ibarra four times, three times in December 2014 and once in April 2015.  At the first visit on December 8, 2014, Dr. Ibarra documented "[Petitioner] had mild pain in his left shoulder after his flu shot a couple weeks ago.  About [two] days after the flu shot [Petitioner] started getting shooting pains around his shoulder and down to his forearm."  Pet. Ex. 2 at 40.  Petitioner reported shooting pain down his arm when he raised his arm and turned his head as well as "mild numbness at the tip of his left index finger."  Id.  Physical examination revealed "[m]ild decreased sensation at finger pad area of left index finger" and "[m]ild left shoulder pain with impingement testing."  Id. at 41.  Petitioner's strength was normal but he had pain with abduction and turning his head to the right.  Petitioner was prescribed a Medrol Dose Pak.

At the second visit on December 12, 2014, Petitioner reported improvement.  On physical examination, Petitioner now had no pain with testing and was tender to palpation with muscle spasm in area between his shoulder and neck (trapezius).  Dr. Ibarra directed Petitioner to apply hot and cold compresses to his left trapezius area.  At the third visit on December 31, 2014, Petitioner had full range of motion in his left shoulder and no swelling, edema, or tenderness.  Petitioner was directed to continue taking Meloxicam and Flexeril, perform shoulder exercises, and apply alternating hot and cold compresses as needed.

Around three-and-one-half months later, Petitioner returned to Dr. Ibarra's office on April 14, 2015. Petitioner reported he had "[l]eft shoulder pain since 11/2014." Pet. Ex. 2 at 49. He indicated new complaints of pain with range of motion with shoulder and left scapular and supraspinatus pain. Petitioner "state[d] that [his] shoulder pain [was] improving, however he would 'like something done' because . . . it [was] 'not going away.'" Id. at 51. Petitioner was seen by Nurse Myers who documented Petitioner's left shoulder pain was moderate, fluctuated in intensity, and was improving. The pain radiated to the neck and down the arm to the left index finger, with numbness in his left index finger. Pain was exacerbated with movement, and relieved with "immobilization, heat application, medication, physical therapy[,] and steroids given in December."[10] Id. On physical examination, Petitioner's "[o]nly abnormal result was [Petitioner's] complaint of tenderness to left trapezius, tenderness at the acromion process with palpation." Id. at 50-51. Petitioner was directed to continue range of motion exercises and was prescribed Flexeril and prednisone. Id.

Overall, Petitioner's treatment course consists of two prescriptions of oral steroids, one prescription of Meloxicam, and two prescriptions for Flexeril over four visits to Petitioner's primary care doctor from December 2014 to April 2015. On December 8, 2014, Dr. Ibarra documented "[m]ild decreased sensation at finger pad area of left index finger" and "[m]ild left shoulder pain with impingement testing." Pet. Ex. 2 at 41. By April 2015, Nurse Myers summarized Petitioner's left shoulder pain was moderate, fluctuated in intensity dependent on movement, and was improving. The undersigned finds no evidence of shoulder pain after August 2015.

The undersigned has considered prior pain and suffering awards in other cases to assist in her determination of an appropriate award. First, she finds Petitioner's reliance on Klausen, Russo, and Knauss misplaced. In each of those cases, the petitioners were awarded $60,000.00 or $63,000.00 for pain and suffering; however, each of those petitioner's treatment course was more extensive and severe than Petitioner's here.

For example, Petitioner acknowledges that the petitioner in Klausen underwent a more extensive treatment than Petitioner, indicating a more severe injury, and the undersigned agrees. Pet. Mot. at 14-15; Pet. Reply Memo. at 7. Petitioner here did not undergo any cortisone injections, MRIs, or physical therapy, unlike the petitioner in Klausen. The undersigned is not persuaded to award Petitioner more than the Klausen petitioner even though both Petitioner and the Klausen petitioner had difficulty sleeping, Petitioner here sought treatment before the Klausen petitioner, and Petitioner contends his pain was more severe than the Klausen petitioner.

Similarly, Petitioner acknowledges the treatment course in Russo was more extensive than his. Pet. Mot. at 15-16. Although the Russo petitioner did not have surgery, an MRI, or steroid injections, she did undergo one urgent care visit, an X-ray, an ultrasound, and 12 physical therapy sessions, none of which Petitioner did here. Again, this course of treatment evidences a more severe injury. Petitioner contends his pain and suffering evidence is better than that presented in Russo given the number of witness affidavits and the details provided in each;

---

[10] It does not appear Petitioner attended any physical therapy.

14

however, the medical records here support a mild to moderate injury that did not require steroid injections, physical therapy, imaging, or specialist visits.

Lastly, the <u>Knauss</u> petitioner underwent physical therapy, an X-ray, two MRIs, and a steroid injection, none of which occurred in this case. The undersigned is not persuaded to award more than the <u>Knauss</u> petitioner received simply because Petitioner here sough treatment 17 days post-vaccination and the <u>Knauss</u> petitioner waited three months.

The undersigned has considered the numbers proposed by both parties, however, she does not agree that the amount suggested by either party is appropriate. Respondent does not provide any similar case to support his reasoning for offering $35,000.00 as a fair and reasonable award for pain and suffering.

Considering the record as a whole, the undersigned finds that $50,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering. The undersigned recognizes that Petitioner's duration of suffering has been shorter than other cases. By comparison to the other cases, Petitioner's course was less severe. He did not require a steroid injection, imaging, physical therapy, treatment with specialists, or surgery. Thus, the undersigned finds his course to be more mild to moderate than that experienced by some of the petitioners in the cases described above. The award of $50,000.00 acknowledges that Petitioner experienced the difficulties described by the witnesses who provided affidavits and letters, including Dr. Dinwiddie and Nurse Nellen, and acknowledges Petitioner's inability to enjoy activities with his family and participate in the sport of horse pulling.

## VI.   CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner should be awarded $50,000.00 for pain and suffering.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master